**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| _____ | : | |
| KUSLIMA SHOGEN, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action No. 04-5695 (SRC) |
| v. | : | |
| | : | **OPINION** |
| GLOBAL AGGRESSIVE GROWTH | : | |
| FUND, LTD., et al. | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

**CHESLER, District Judge**

THIS MATTER comes before the Court on motions for partial summary judgment by

Defendants Scharff Witchel & Co., Inc. ("Scharff Witchel"), Sam Witchel and Gregory ("Greg")

Witchel[1] [docket # 81], and by pro se Defendant Richard S. Cohen ("Cohen") (collectively

"Defendants") [docket # 83].  The Plaintiff, Kuslima Shogen ("Shogen"), filed briefs in

opposition to these motions [docket # 84, 96], and the Witchel Defendants have submitted a

reply brief [docket # 90].  The Court, having considered the papers submitted, for the reasons set

forth in this opinion, and for good cause shown, **GRANTS IN PART** and **DENIES IN PART**

the motions for partial summary judgment.

_____

[1] Scharff Witchel, Sam Witchel and Greg Witchel are collectively referred to as the
"Witchel Defendants."

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Kuslima Shogen is the founder, CEO and Chairman of the Board of Directors of Alfacell

Corporation ("Alfacell"), a biopharmaceutical company engaged in cancer research.  Shogen has

both a masters degree and a Ph.D. in biology.  Shogen also served as Alfacell's interim CFO for

a limited time in the late 1990s.  Alfacell is incorporated in Delaware and based in Bloomfield,

New Jersey.

Alfacell has been routinely undercapitalized and at one time was delisted from the

NASDAQ for failing to meet its capital requirements.  Consequently, when the events giving rise

to the present litigation began, Shogen was in search of private investment capital and loans to

raise money for Alfacell.  In December 2001, Shogen was contacted by Dr. Jeffrey Berg ("Dr.

Berg"), a Ph.D., who is a business consultant in the biotechnology field.  Dr. Berg was aware of

Alfacell's weak financial position and contacted Shogen because he thought he might be able to

obtain financing for Alfacell.  Shogen met with Dr. Berg, who told Shogen that he could

introduce her to "what he termed as very competent financial advisers."  (Shogen Dep. vol. 1,

80:17, Sept. 9, 2005)

Dr. Berg contacted Sam Witchel, who was an officer of Scharff Witchel, a New York

corporation whose sole office is in midtown Manhattan.  Dr. Berg explained to Sam Witchel that

Shogen was in dire need of money and was interested in a PIPE (Private Investment in Public

Equity), a transaction in which a private investor purchases stock at a discount in order to raise

capital for the issuing company.[2]  Sam Witchel and his son, Greg Witchel, who also served as an

---

[2] Shogen testified that she originally thought that the Witchel Defendants would be
lending her money but she later learned that they were financial advisors who would serve as
intermediaries for Shogen and hopefully set her up with a willing lender.

officer of Scharff Witchel until December 2002, thought that they might be able to get a PIPE for Alfacell because investors would be interested in a company engaged in cancer research. However, as a result of Alfacell's undercapitalization, the Witchel Defendants were unable to find a private investor willing to fund a PIPE for Alfacell.  Instead, Greg Witchel suggested that Shogen might be able to borrow against her personal shares in Alfacell.  According to Shogen, Greg Witchel indicated to her that Scharff Witchel had participated in a number of similar transactions before and would find Shogen a reputable lender and a favorable interest rate.  But, according to Sam Witchel, the Witchel Defendnants' role in securing Shogen's loan ended once it became clear that they could not find a PIPE for Alfacell.  The Witchel Defendants contend that at that point Scharff Witchel handed the Shogen transaction over to the Richard Cohen, an officer and principle of the Ruby Group, a New York corporation that specialized in collateralized financings.[3]  Sam Witchel testified that once Shogen received Scharff Witchell's non-disclosure and non-circumvention ("NDNC")[4] agreement he

> called up Mr. Cohen and told him that [Shogen wanted] to do the deal, and to punch up her computer filings and can he do the deal, and he called me back and said they would and I said fine, here's her name and number. Call her.  That, sir, is the end of the ball game for [Scharff Witchel].

---

[3] According to the Witchel Defendants, Scharff Witchel was not engaged in arranging loans for individuals collateralized by shares of stock (i.e. stock pledge loans).  The Ruby Group had solicited Scharff Witchel based on their purported expertise in arranging collateralized (stock pledge) loans.  According to their promotional materials the Ruby Group "tailors a contract," and "[u]pon the client's repatriation of the loan all of the securities offered as collateral are returned to the client."  (Shea Cert., Ex. FF, Promotional Materials for the Ruby Group on Collateralized Loans.)

[4] Shogen does not recall signing the NDNC agreement and the Witchel Defendants have failed to produce a signed copy.

(S. Witchel Dep. 64:18-23, Sept. 20, 2005)

According to Shogen, Cohen called and told her that the Ruby Group would be "working with the Witchels to expedite this transaction" and that A.J. Watson ("Watson"), who was also an officer and principle of the Ruby Group, would serve as the point man.[5]  (Shogen Dep. vol. 1, 124:1-4.)  On or about January 4, 2002, Shogen received a loan agreement from International Mercantile Holding Group, Inc. ("IMHG"), a New York based lender.  The Ruby Group faxed the loan documents to Scharff Witchel, who in turn faxed them to Shogen.  Under the terms of the proposed loan Shogen would pledge 900,000 shares of Alfacell as collateral for a $150,660 loan.  The interest rate on the loan was 4.5% annually, which Shogen considered favorable.  The agreement provided that the Pledgee, IMHG, would not sell, assign or transfer any of the pledged collateral shares and that in the absence of a default the Pledgor, Shogen, would continue to exercise all voting rights on behalf of the pledged collateral shares.  (Shea Cert., Ex. M, Pledge Agreement between Kuslima Shogen and International Mercantile Holding Group.)

Shogen recalls discussing the agreement with Greg Witchel before signing it.  Shogen claims that Greg Witchel represented to her that it was a customary agreement and that Scharff Witchel had made deals with IMHG in the past.  Although Shogen was pleased with the interest rate, she thought the collateral was "a little too rich," for even though Alfacell was trading at under a dollar, 900,000 shares were valued well in excess of $150,000 at that time.  (Shogen Dep. vol. 1, 163:11.)  However, Shogen proceeded with the transaction because she believed, based on her discussion with Greg Witchel, that she could eventually borrow more money

---

[5]  Watson and Cohen were 50% shareholders in the Ruby Group from its inception until at least July 2004.

4

against the pledged collateral shares if their market value increased.  For his part, Greg Witchel recalls that Scharff Witchel might have received the loan documents from the Ruby Group and transmitted them to Shogen, but does not recall reviewing the documents or discussing them with Shogen.  (G. Witchel Dep. 62:15-65:25, Sept. 12, 2005)

For reasons that are not entirely clear, the IMHG loan agreement was never consummated.  Shogen executed the loan documents, but the loan was never funded.  According to Shogen, none of the Defendants explained to her why the IMHG transaction fell through.  The Witchel Defendants claim that the decision to proceed with another lender, and the choice of the replacement lender, belonged to the Ruby Group alone—Scharff Witchel was never even informed that the lender had changed.  Shogen testified that Greg Witchel and A.J Watson informed her they had found a better lender who could loan her more money.  And Cohen asserts that the Ruby Group decided to cut off the transaction because of "ethical doubts" over IMHG.

As part of the proposed loan agreement with IMHG, Shogen was required to remove "restrictive legends" from the 900,000 pledged collateral shares.  The restrictive legends prevented the shares from being sold.  Shogen's shares had contained restrictive legends because, as a controlling insider of Alfacell, her ability to sell her personal shares was limited by SEC regulations.  According to Shogen, Greg Witchel, who "was the architect of this [the IMHG] transaction," explained that she needed to remove the legends before the shares could be pledged as collateral.  (Shogen Dep. vol. 1, 44:12-13, 45:8-17.)  Because Shogen had held the 900,000 shares for over two years, under the applicable SEC regulations the shares became freely tradable once the restrictive legends were removed.  Greg Witchel claims that he was not familiar that the restrictive legends were an issue and remembers only that the Ruby Group might have asked him

about the restrictive legends.  In the end, however, Shogen removed the restrictive legends from her shares, which remained freely tradable after the IMHG transaction fell through.

According to Shogen, the Witchel and Ruby Defendants presented her with a new set of loan documents a few days after she executed the IMHG documents.  The Ruby Group had chosen another lender, Global Aggressive Fund Limited ("Global Aggressive"), a Bahamian company.   The terms of the new loan agreement with Global Agressive were similar to those contained in the IMHG loan: Shogen was asked to pledge 900,000 freely tradable shares in exchange for a loan of $167,000 with an annual interest rate of 4.5%.  On January 8, 2002, Sean Nottage ("Nottage"), a principle of Global Aggressive, emailed the loan agreement to Watson.  Shogen executed the documents and faxed them back to Watson that evening.  On the morning of January 9, 2002, Watson faxed a copy of Shogen's signature pages to Nottage.

The Witchel Defendants contend that Shogen did not confer with them between the time she received the Global Aggressive documents and the time she faxed the signature pages back to Watson.  The Witchel Defendants claim that they never saw the Global Aggressive loan documents.  While they may have reviewed the term sheet they did not know, for instance, that Global Aggressive was a Bahamian company or any specific terms in the agreement, except for the basic terms contained on the term sheet, i.e., the interest rate, the amount of the loan, the amount of collateral.  At his deposition, Nottage stated that he had never heard of Sam and Greg Witchel or of Scharff Witchel.

The Witchel Defendants and Cohen also represent that Shogen held herself out as a sophisticated business person.  Greg Witchel believed that Scharff Witchel's role in this transaction was to find Shogen a lender but that she would negotiate favorable terms for herself,

6

aided by Alfacell's corporate resources.  In his deposition testimony, Greg Witchel said: "To my knowledge, Ms. Shogen was the chief executive officer, president, CFO of Alfacell . . . and every issuer that we dealt with had its own SEC counsel and CPA.  It was their role to act on behalf of their corporation, not ours."  (G. Witchel Dep. 56:5-10.)

Shogen tells a different story.  From the outset, Shogen was concerned that her pledged collateral shares would be secure.  Shogen testified that she went over the global aggressive contract with Greg Witchel and he assured her the only way she stood to lose her pledge collateral shares was if she failed to meet her obligation under the loan agreement to make timely interest payments.  (Shogen Dep. vol. 1, 115:8-16.)  She stated that she received assurances from Cohen and Watson, in addition to Greg Witchel, that the transaction before her with Global Aggressive was customary and "perfectly fine," and she was repeatedly assured that her shares were safe as long as she did not default on her interest payments.  (Shogen Dep. vol. 3, 54:7-18, 72:5-8, 79:14-22, Mar. 15, 2006)

When Shogen noticed in the loan agreement that Global Aggressive was a Bahamian corporation she became concerned and called Greg Witchel.  According to Shogen, Witchel told her that Global Agressive "was a legitimate lender" and a "large fund and . . . a reputable fund." (Shogen Dep. vol. 1, 190:6-8.)  Shogen also spoke with Cohen and Watson at the Ruby Group who told her that Global Aggressive was "a great fund," "a multimillion dollar fund" and that "[t]hey funded before."  (Shogen Dep. vol. 1, 191:13-16.)  Shogen did not review the loan agreement with an attorney.

Under the terms of the loan Shogen received $164,633.50 by a wire transfer, which posted to her account on January 17, 2002.  The loan also carried a 4.5% annual interest rate.

After Shogen received the wire transfer from Global Aggressive, she transferred most of the loan proceeds to Alfacell.[6]  (Id. at 190-193.)  The loan agreement directed Shogen to make semi-annual interest payments to Geek Securities Inc. ("Geek Securities"), a Florida company.

It was Shogen's understanding that under the terms of the loan agreement Global Aggressive could not sell the pledged Alfacell shares unless she defaulted on her loan payments. In fact, however, the agreement between Shogen and the Global Fund contained paragraph 1(b), which provided that:

> At any time . . . without the consent of, or notice to, Pledgor, without incurring any liability to Pledgor and without impairing or releasing the obligations of Pledgor under this Agreement, Pledgee may [] sell, hypothecate, assign, hedge, transfer, set over, exchange, release, dispose of, or otherwise deal with, all or any part of Pledgee's rights in the Pledged Collateral.

(Shea Cert., Ex. W, Global Aggressive Loan Agreement at S0056.)  Global Aggressive expeditiously exercised their rights under paragraph 1(b).  Between January 16 and February 4, Global Agressive sold the pledged Alfacell shares.  The proceeds of the sales totalled over $400,000.  (Soos Cert., Ex. N, Global Aggressive Account Detail and Record of Securities Purchased and Sold at FNF0005-FNF0006.)

In March 2002, the Ruby Group prepared a proposal for Shogen to obtain an equity line of credit and forwarded it to the Witchels.  Scharff Witchel approached Shogen to solicit her interest in a second loan.  According to Sam Witchel, Shogen told him that she was simply not

---

[6]   Shogen paid $2,000 to Dr. Berg and about $9,000 to Scharff Witchel for their services in connection with the loan transaction.  Scharff Witchel also paid Dr. Berg $1963.60 for steering Shogen to them.  (Soos Cert., Ex. L, Check from Scharff Witchel to Jeffrey Berg at SW0003.) Although Shogen never paid anything to the Ruby Group (Shogen Dep. vol. 1, 198:18-199:9), the Ruby Group received $27,000 in a wire transfer from Global Aggressive.  (Soos Cert., Ex. X, Wire Transfer Record from Global Aggressive to the Ruby Group at FNF0105-FNF0107.)

interested, although Shogen claims that she made it known that the reason she refused to proceed

was because she had no shares left to collateralize.

It is not clear from the record when exactly Shogen discovered that her shares had been

sold.  But in the days and weeks following her agreement with Global Aggressive Shogen

became aware of an increase in the trading volume of Alfacell.  Shogen testified that

> [Alfacell] had gotten a lot of phone calls from brokers and shareholders who said
> where is all this stock coming from, somebody is dumping all this stock, and that
> was my call to [Cohen] and to Greg [Witchel] and to [A.J.] Watson saying, "Are
> you sure you're not shorting this stock?  Where is this stock coming from?"  I
> couldn't imagine what the – because the volume was quite out of the ordinary.
> And you guys repeatedly assured me, "No, no, no, no; it's not your stock."

(Shogen Dep. vol. 3, 62:23-63:8.)  Shogen made her first two payments to Geek Securities on

time.  Her second payment, however, was returned as undeliverable in June 2002.  Concerned

that her Alfacell shares had been traded, Shogen attempted to contact Scharff Witchel and the

Ruby Group.  By this time, Greg Witchel had left Scharff Witchel.  Shogen claims that she spoke

to Sam Witchel and he assured her that Greg would get back to her, though he never did.

According to Sam Witchel, Shogen called him and demanded "I want my stock back . . . you

have to give me my stock back . . . ."  (S. Witchel Dep. 84:17-18.)  Sam Witchel claims that he

contacted Cohen, who in turn attempted to get in touch with Nottage, but nothing came of these

efforts.

Shogen eventually found answers about her pledged shares, though they were not the

answers she had hoped for.  Geek Securities, she learned, had been shut down by the SEC, and

Global Aggressive was a shell company, not a multimillion dollar fund.  The Ruby Group had

also dissolved; Watson and Cohen were on their own.  Greg Witchel did not get back to her.

Multiple attempts to contact Sean Nottage were unsuccessful.  Shogen instructed Alfacell to

investigate the matter and it was eventually determined that Shogen's stocks were lost and she would not be able to recover them.

Shogen commenced this lawsuit on November 18, 2004, naming as Defendants the Global Aggressive Growth Fund, and its corporate affiliate, Aggressive Partners, Geek Securities and its corporate affiliate, Geek Advisors, Inc., and their principles Kautilya Sharma, Charles J. Kerns, Sr. and Lewis Hodges.  Shogen also named the Witchel Defendants, Cohen, Watson, the Ruby Group ("Ruby Defendants") and Sean Nottage.  Shogen's complaint alleges fifteen causes of action, thirteen of which are asserted against the Witchel and Ruby Defendants: (I) common law fraud, (II) violation of the New Jersey Consumer Fraud Act, (III) violation of the New Jersey Loan Broker Statute, (IV) violation of Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, (VI) negligent misrepresentation, (VII) common law breach of fiduciary duty, (VIII) common law negligence, (IX) breach of contract, (XI) breach of the covenant of good faith and fair dealing, (XII) promissory fraud, (XIII) equitable fraud, (XIV) willful and wanton misconduct, and (XV) unjust enrichment.  Counts V and X also sound in negligence and breach of contract but are asserted only against Global Aggressive, Aggressive Partners and Sean Nottage.  Nottage was terminated from this lawsuit on October 24, 2005 pursuant to a joint stipulation between himself and Shogen.

Global Aggressive and Aggressive Partners Inc. are now defunct, as are Greek Securities and Greek Advisors, Inc.  Their principals, Kautilya Sharma, Charles J. Kerns, Sr. and Lewis Hodges have been prosecuted by the United States Attorney for the Southern District of Florida for, inter alia, conspiracy to commit securities and wire fraud as part of a broader stock loan scheme perpetrated to defraud numerous borrowers.  In 2005, default judgments were entered

10

against the aforementioned parties for failing to appear.  After discovery and depositions, the Witchel Defendants moved for summary judgments on all claims asserted against them except Count VIII, common law negligence.  Cohen has moved for summary judgments on all claims asserted against him.

## II.    STANDARD FOR SUMMARY JUDGMENT

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996).  In deciding whether there is a disputed issue of material fact, the Court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Penn. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

Once the moving party has properly supported its showing of no triable issue of fact and of an entitlement to judgment as a matter of law, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts."  Matsushita, 475 U.S. at 586; see also Anderson, 477 U.S. at 247-48.  The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Celotex, 477 U.S. at 324; Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363

(3d Cir. 1992) ("to raise a genuine issue of material fact . . . the [non-moving party] need not match, item for item, each piece of evidence proffered by the movant," but rather "must exceed the 'mere scintilla' threshold").

## III.   DISCUSSION

### A.   New Jersey Consumer Fraud Act (Count II)

In count II of her complaint, Shogen alleges that Defendants made false representations to her regarding the terms of the Global Aggressive stock pledge loan, and in doing so violated the New Jersey Consumer Fraud Act ("NJCFA"). Defendants, all New York residents, argue that New York law should apply to Shogen's non-federal claims because New Jersey's only contact to the litigation is Shogen's residence.  The New York Consumer Fraud Act, N.Y. GEN. BUS. LAW § 319(a) (prohibiting "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service"), has been held not to apply to loan transactions. See Goodhue v. Jock, 888 F. Supp. 358, 364 (N.D.N.Y. 1995); Quail Ridge Assoc. v. Chem. Bank, 162 A.D.2d 917, 920 (N.Y. App. Div. 1990) (New York Consumer Fraud Act only "prohibits those deceptive practices which are of a recurring nature and affect the public interest").  Shogen agrees that her claim would be barred under the New York Consumer Fraud Act but maintains that the Global Aggressive stock pledge loan is covered by the NJCFA. Defendants contend, however, that even if New Jersey law were to apply, the Global Aggressive stock pledge loan is still beyond the scope of the NJCFA.

Federal district courts sitting in diversity apply the choice of law rules of the state in which they sit.  McFarland v. Miller, 14 F.3d 912, 917 (3d Cir. 1994).  New Jersey applies a governmental-interest analysis to determine choice of law questions.  Veazey v. Doremus, 103

N.J. 244, 247 (1986).  "Under that analysis, the determinative law is that of the state with the greatest interest in governing the particular issue."  Id. at 248.  This analysis proceeds in two steps.  "The first step in the analysis is to determine whether a conflict exists between the law of the interested states."  Id.  The second step is to identify "the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties."  Id.  If "a state's contacts are not related to the policies underlying its law, then that state does not possess an interest in having its law apply."  Id.

For there to be an actual conflict, the "differences in [the respective states'] laws must have a significant effect on the outcome of the trial."  Complaint of Bankers Trust Co., 752 F.2d 874, 882 (3d Cir. 1984).  Where the application of the law of each state to the facts in a specific issue would result in the same outcome, an actual conflict does not exist.  See, e.g., Lucker Mfg. v. Home Ins. Co., 23 F.3d 808, 813 (3d Cir. 1994).  If, as Defendants argue, the stock pledge loan between Shogen and Global Aggressive is beyond the scope of the NJCFA, there would not be an actual conflict because Shogen would not have a valid claim under either New Jersey or New York law.  Accordingly, the Court must first determine whether the NJCFA applies to the loan agreement between Shogen and Global Aggressive.

The NJCFA prohibits, inter alia, "misrepresentation . . . in connection with the sale or advertisement of any merchandise . . . ."  N.J. STAT. ANN. § 56:8-2.  Merchandise is defined to "include any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale."  N.J. STAT. ANN. § 56:8-1(c).  The Third Circuit has explained that the phrase *anything offered, directly or indirectly to the public for sale* is "not a 'catch-all phrase' . . . but instead should be 'construed under the doctrine of ejusdem generis as a

comprehensive definition intended to incorporate other products or services similar in nature to those enumerated by the specific words' which precede it." J & R Ice Cream Corp. v. Cal. Smoothie Licensing Corp., 31 F.3d 1259, 1272 (3d Cir. 1994) (quoting Neveroski v. Blair, 141 N.J. Super. 365, 379 (1976)).  The Third Circuit held in J & R Ice Cream that a franchise was not "merchandise," explaining that franchises are purchased "for the present value of the cash flows they are expected to produce" rather than for consumption.  Id. at 1274.  It relied in part on the language from Neveroski which explained that

> the Consumer Fraud Act is pointed to products and services sold to consumers in the popular sense. Such consumers purchase products from retail sellers of merchandise consisting of peronal property of all kinds or contract for services of various types brought to their attention by advertising or other sales techniques. The legislative language throughout the statute and the evils sought to be eliminated point to an intent to protect the *consumer* in the context of the ordinary meaning of that term in the market place.

Neveroski, 141 N.J. Super at 378.  The Third Circuit also considered the fact that the franchise was not available to the public at large, mass produced, or sold in large quantities.  J & R Ice Cream, 31 F.3d at 1974 (citing BOC Group, Inc. v. Lummus Crest, Inc., 251 N.J. Super 271, 279-80 (1990)).

Shogen's stock pledge loan is not merchandise according to the Third Circuit's understanding of the term in  J & R Ice Cream.  The loan transaction that Shogen engaged in is not available to "consumers in the popular sense."  It is not advertised to the public, available to consumers in the ordinary market place, mass produced or available in large quantities.  It is more accurately characterized as a rare, specialized and complex transaction, whose availability is restricted to a small number of corporate insiders who hold a significant volume of corporate stock.

Shogen cites one New Jersey Supreme Court case, Lemelledo v. Benefit Mgmt. Corp., 150 N.J. 255 (1997), in arguing that loan services are covered by the NJCFA. In Lemelledo, the New Jersey Supreme Court held that the NJCFA applies to lenders who engage in loan packing schemes. The loan contract at issue in Lemelledo was for $2,538.47, which included $335.28 in credit insurance premiums which were "packed" onto the principle of the loan in alleged violation of the NJCFA. Id. at 259. Unlike the Global Aggressive stock pledge loan, the small consumer loan at issue in Lemelledo was borrowed on the plaintiff's personal credit and widely available to the public at large. The New Jersey Supreme Court concluded that the NJCFA applied to the "offering, sale, or provision of *consumer credit*." Id. at 265 (emphasis added). However, Shogen's loan was not a consumer credit loan but a collateralized stock pledge loan. Lemelledo does not provide an authority for concluding, as Shogen does, that "the NJCFA has been applied to numerous services similar to the ones at issue here." (Pl.'s Br. in Opp'n to Witchel Mot. at 14.) Further, the Third Circuit has noted in an unpublished opinion that "no intervening decision from the New Jersey Supreme Court has cast doubt on the correctness of [J & R Ice Cream]." A.H. Meyers & Co. v. CNA Ins. Co. 88 Fed. Appx. 495, 499 (3d Cir. 2004). See also Waterloov Gutter Protection Sys. Co. v. Absolute Gutter  Protection, L.L.C., 64 F. Supp. 2d 398, 424 (D.N.J. 1999) (applying J & R Ice Cream in a post Lemelledo case and holding that a financial stake in a start-up company is not merchandise under the NJCFA).[7]

_____

[7] In Kavky v. Herbalife Int'l of Am., 359 N.J. Super. 497, 500-01 (2003), the New Jersey Appellate Division rejected the Third Circuit's "unduly restrictive interpretation" of the NJCFA in J & R Ice Cream. However, while this Court must ordinarily give "significant weight" to lower state court decisions in the absence of any indication that the highest state court would rule otherwise, National Mut. Ins. Co. v. Budd-Baldwin, 947 F.2d 1098, 1101 n.6 (3d Cir. 1991), when, as here, the Third Circuits has predicted how a state's highest court would rule on a particular issue, this Court must follow that prediction. See Woessner v. Air Liquide, Inc., 242

Therefore, because neither the New York Consumer Fraud Act nor the New Jersey

Consumer Fraud Act applies to collateralized stock pledge loans there is no actual

conflict—Shogen may not assert a claim under either statute.  The Court accordingly determines

that Defendants' are entitled to judgment as a matter of law on the claims asserted against them

under NJCFA and will grant their motion for summary judgment as to that claim.

     B.     New Jersey Loan Broker Statute (Count III)

Count III of Shogen's complaint alleges that Defendants violated the New Jersey Loan

Broker Statute ("NJLBS").  Defendants argue that they are entitled to summary judgment on this

count because the state of New York, whose law they contend should apply, has no counterpart

to the NJLBS.  Further, Defendants argue that even if the NJLBS does apply they do not fit

within the definition of loan brokers under the statute.  The Court will first address the

applicability of the NJLBS because if the terms of that statute do not apply to the Global

Aggressive transaction then, as explained above, there would not be a true conflict between New

York and New Jersey law as neither would apply.

Defendants argue that they do not fall within the definition of a loan brokers under the

NJLBS because they acted as finders who merely brought the parties together but did not

negotiate the terms of the loan.[8]  Defendants cite only two New Jersey cases, Oscar Mayer Corp.

v. Mincing Trading Corp., 744 F. Supp 79 (D.N.J. 1990) and M. Dean Kaufman, Inc. v. Amer.

---

F.3d 469, 471 (3d Cir. 2001); Schum v. Bailey, 578 F.2d 493, 504 (3d Cir. 1978).

    [8] A broker is an "agent who acts as an intermediary or negotiator . . . employed to make bargains and contracts between other persons in matters of trade," while a finder is "[a]n intermediary who brings together parties for a business transaction" but does not negotiate terms. BLACKS LAW DICTIONARY 153, 510 (7th abr. ed. 2000).

Machine & Foundry Co., 102 N.J. Super 1 (1968), both of which discuss common law agency doctrine and not claims brought pursuant to the NJLBS.[9]  Indeed both of those cases preceded the enactment of the LBS in 1992.  See 1992 N.J. Laws 66.

The NJLBS defines a loan broker as "any person who . . . For or in expectation of consideration, assists or advises or offers to assist or advise a borrower in obtaining or attempting to obtain a loan of money, credit card or line of credit."  N.J. STAT. ANN. § 17:10B.  The statute provides that "No loan broker shall:"

> (b) Make or use any false or misleading representations or omit any material fact in the offer or sale of the services of a loan broker or lender, whether real or purported; [or]
>
> (c) Engage, directly or indirectly, in any act that operates or would operate as fraud or deception upon any person in connection with the offer or sale of the services of a loan broker or lender, whether real or purported, notwithstanding the absence of reliance by the borrower;

N.J. STAT. ANN. § 17:10B-2.  The statute further provides that "[a]ny borrower injured by a violation of this act may bring an action for recovery of damages."  N.J. STAT. ANN. § 17:10B-6.  For the purposes of the NJLBS, a borrower is defined as "a person obtaining or desiring to obtain a loan of money, credit card or line of credit for personal, family or household use."  N.J. STAT. ANN. § 17:10B-6.  Because Shogen's purpose in obtaining a loan was to raise money for Alfacell, the Court determines that even if Defendants are loan brokers under the broad terms of the NJLBS, Shogen is not a borrower under the statutory definition and therefore may not assert a claim pursuant to the NJLBS.

---

[9]  Unfortunately, Defendants cite mostly New York cases to support their argument that they are not brokers.  These cases, however, deal with the common law distinction between a broker and a finder and not with the definition of a broker under the NJLBS.

Shogen's transferred the bulk of the proceeds she received from the Global Aggressive stock pledge loan directly to Alfacell.  (Shogen Dep. vol. 1, 193:14-18.)  It is not disputed that Shogen's purpose in attempting to obtain financing, first through a PIPE and then through a stock pledge loan, was to raise money for Alfacell.  Therefore, the loan of money was not for personal, family or household use as required by the NJLBS.  Accordingly, there is no actual conflict between New Jersey and New York law because the NJLBS does not apply to a borrower such as Shogen who seeks financing on behalf of a corporation and, as previously mentioned, New York had no loan broker statute which might apply.

Because Shogen is not a borrower under the definition of the NJLBS she cannot bring an action for damages under the act.  The Court will grant Defendants motion to dismiss Shogen's claims against them under the NJLBS.[10]

C.    Securities Exchange Act and Rule 10b-5 Violations (Count IV)

In Count IV of her complaint Shogen alleges that Defendants violated the Exchange Act and Rule 10b-5 by knowingly misrepresenting that IMHG and Global Aggressive were viable lenders; that IMHG and Global Aggressive were lenders that Shogen could feel comfortable with; that the pledged collateral was reasonable; that Shogen would be able to borrowing more money as Alfacell's stock price increased; that the terms of the transaction with Global Aggressive were reasonable; that the pledged collateral would be held, safeguarded, and returned upon repayment of the loan; that the pledged collateral could not be sold in any form unless Shogen defaulted in making loan payments; that Shogen would maintain her voting rights in the

---

[10]  Neither party points to any conflicts between New Jersey and New York law aside from the NJCFA, the NJLBS and the breach of contract claim.  Accordingly, the Court will apply New Jersey law to all other state law claims.

shares; and that a stock pledge loan was the best vehicle for Shogen to obtain a short-term loan at an attractive interest rate while simultaneously protecting her equity in the company.

"The Securities and Exchange Commission's Rule 10b-5, promulgated under § 10(b) of the Securities Exchange Act of 1934 (Act), prohibits, in connection with the purchase or sale of any security, the making of any untrue statement of a material fact or the omission of a material fact that would render statements made not misleading." Basic Inc. v. Levinson, 485 U.S. 224, 224, (1988). Section 10(b) prohibits the "use or employ . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b).

A claim under Section 10(b) of the Securities Exchange Act of 1934 or Rule 10b-5 "must show that the defendant (1) made a misstatement or an omission of a material fact (2) with scienter (3) in connection with the purchase or the sale of a security (4) upon which the plaintiff reasonably relied and (5) that the plaintiff's reliance was the proximate cause of his or her injury." In re Ikon Office Solutions, Inc., 277 F.3d 658, 666 (3d Cir. 2002). Scienter can either be intentional fraud or recklessness. See In re Advanta Corp. Sec. Litig., 180 F.3d 525, 535 (3d Cir. 1999) (Defendants' conduct was "an extreme departure from the standards of ordinary care, and presented a danger of misleading buyers or sellers that [was] either known to the defendant or is so obvious that the actor must have been aware of it."); McLean v. Alexander, 599 F.2d 1190, 1198 (3d Cir. 1979). In Ikon, the Third Circuit instructed that

> to establish securities fraud, plaintiffs must establish a more exacting threshold of scienter –"a mental state embracing intent to deceive, manipulate or defraud," . . ., or, at a minimum, "highly unreasonable (conduct), involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care,. . . which presents a danger of misleading [the parties to the transaction] that is either known to the defendant or is so obvious that the actor

19

must have been aware of it."

Ikon, 277 F.3d at 667. (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976); SEC

v. Infinity Group Co., 212 F.3d 180, 192 (3d Cir.2000), cert. denied, 532 U.S. 905 (2001)).

A plaintiff can establish an inference of scienter by adducing direct or circumstantial

evidence either (1) to show that Defendants had both a motive and opportunity to commit fraud,

or (2) showing conscious misbehavior or recklessness.  In re Alpharma Inc. Sec. Litig., 372 F.3d

137, 148 (3d Cir. 2004).  A plaintiff can show conscious misbehavior by demonstrating that

defendants had actual knowledge that their statements were false or misleading at the time they

were made.  GSC Partners CDO Fund v. Washington, 368 F.3d 228, 239 (3d Cir. 2004). When

arguing that a defendant had a "good faith" belief in the veracity of his statements, courts

"assume that a defendant can genuinely have a subjective belief that demonstrates good faith

even though it is the result of reckless conduct.  However, it clearly can be argued that a

subjective belief based on inquiry that is reckless can never properly be considered a 'good faith'

belief."  Infinity Group, 212 F.3d at 193 n.16 (3d Cir. 2000).  In other words, it will not suffice

for Defendants to show that they had a good faith belief in the truth of their statements if Shogen

shows that Defendants were reckless in not knowing information that would prove those

statements to have been false or misleading.

Shogen does not argue motive and opportunity, but alleges, under the second method of

proving scienter, that Defendants knew (or should have known) that they made material

misrepresentations to Shogen, or that Defendants knowingly omitted material facts regarding the

Global Aggressive transaction.  In order for her to establish the level of scienter required for

proving a violation of the Securities Exchange Act, Shogen must show that Defendants knew

20

these representations were false, or that they were made recklessly.  The Court will deal with each of these issues in turn.

As to the issue of Defendants' knowledge, Shogen adduces no evidence that Defendants knew that their statements were false at the time they were allegedly made.  Shogen's assertion that the Witchel Defendants and Cohen acted in concert with Global Aggressive in order to defraud her is simply without any support in the record.   None of the Defendants benefitted from the sale of Shogen's stock.  They were compensated for the services the same as they would have been had the transaction gone smoothly.  In fact, the sale of Shogen's stock was detrimental to Defendants' interests because it prevented them from setting up a second stock pledge loan for Shogen at a future date.  Shogen's testimony cited to support the inference that Defendants knowingly made false statements to her is insufficient to infer the requisite mental state required under the Exchange Act.  Shogen has failed to meet her burden by pointing to specific facts in the record that would indicate that Defendants had any knowledge that the statements they allegedly made to her were false.  Instead, Shogen makes a conclusory statement that Defendants knowingly made false statements to her and then cites those portions from her deposition testimony where she recounts those statements.  She does not explain how a factfinder might draw a reasonable inference that the statements were knowingly false—indeed, the Court concludes that such an inference would be unreasonable.

Shogen's citation to the expert report by Chip Morrow (the "Morrow Report") is also insufficient to infer Defendants' knowledge because that report states only that the Defendants did not perform due diligence, and acted negligently in performing services for Shogen.  (Soos Cert., Ex. K, Report of J.F. "Chip" Morrow at 8-9.)  The Morrow Report does not conclude that

21

Defendants intentionally made false statements to Shogen.  Neither is there a reasonable basis to assume, as Shogen does, that simply because Defendants assured Shogen that her shares could not be sold, that their actions ipso facto rose to the level of "conscious misbehavior."  See Advanta, 180 F.3d at 539 (conclusory assertions that Defendants acted "knowingly" or "must have known" that a fraud was afoot are insufficient to establish scienter).

Shogen could also prove scienter by showing that Defendants, short of having actual knowledge of their false statements, nonetheless acted recklessly with respect to representations made to her.  The Third Circuit has defined a "reckless statement" for securities fraud purposes as one "involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, [] which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  Advanta, 180 F.3d at 535 (quoting McLean, 599 F. 2d at 1197).  A permissible inference of recklessness can be drawn if Shogen can show "[a]n egregious refusal to see the obvious, or to investigate the doubtful."  Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000).

Shogen argues that because the pledged collateral, in retrospect, turned out to be well in excess of the value of the loan, Defendants were reckless in not advising her that the pledged collateral was excessive.  This, however, was far from obvious at the time of the transaction.  During the period in question Alfacell shares declined from $.77 on January 16, 2002, to $.36 on January 30, 2002, and then rose $.60 a share by March 1, 2002.  (Soos Cert., Ex. N, Global Aggressive Account Detail and Record of Securities Purchased and Sold at FNF0005-FNF0006.)  It was not unreasonable, and certainly not reckless, to believe that 900,000 shares of Alfacell may have declined to the point that they would barely have covered Shogen's $167,000 loan.

22

Given Alfacell's low share price, volatility, and undercapitalization, Defendants' failure to inform Shogen that the pledged collateral was excessive did not, as a matter of law, constitute extreme departure from the standard of ordinary care.

Shogen also argues that Defendants recklessly and repeatedly assured her, even after she received the loan documents, that the pledged collateral shares could not be alienated unless she defaulted on loan payments to Global Aggressive.  According to Shogen's testimony, she emphasized to Defendants before, during, and after the Global Aggressive transaction that she was concerned for the safety of her shares.  She reiterated that she would enter into a transaction that allowed her shares to be sold only in the case that she failed to make interest payments.[11]  A factfinder could believe Shogen's testimony that Defendants advised her to sign the loan agreement, although it contained terms that were contrary to Shogen's clear and repeated intention.  If Defendants had read the loan documents before transmitting them to Shogen, they would have discovered that the agreement gave Global Aggressive the right to freely alienate the pledged collateral shares.  If, as Shogen testified, she repeatedly and emphatically instructed Defendants that she would not accept any loan agreement where her shares could be sold unless she defaulted, and they nonetheless transmitted loan documents to her with assurances that her pledges collateral shares were in fact secure, a reasonable factfinder might well conclude that this misrepresentation was an egregious or extreme departure from the standard of care Defendants were expected to exercise.

---

[11]   During her deposition by Cohen, Shogen testified that: "I came to all of you with the same question and all of you repeatedly, including [Cohen], Greg Witchel, A.J. Watson, have said to me . . . that my shares were safe and I had nothing to worry about, just make sure I don't default on the interest payments.  That was my constant concern, as you [Cohen] know." (Shogen. Dep. vol. 3, 54:10-18.)

Of course, this determination requires a conclusion that Defendants acted as more than mere finders for Shogen, that there was an understanding that they were rendering meaningful advice and that she would rely on them to secure terms according to her repeatedly stated wishes. Obviously, if a factfinder accepted Defendants' version of the facts, that they reasonably believed that Shogen was in contact with competent SEC counsel to assist her in this transaction, then their conduct could not have been reckless. It is abundantly clear, then, that the relationship between Shogen, the Witchel Defendants and Cohen is the subject of conflicting testimony that cannot be resolved on a motion for summary judgment. Therefore, the Court will deny Defendants motion for summary judgment on the claims asserted against them under the Securities Exchange Act and Rule 10b-5.

> D.    Common Law & Promissory Fraud (Counts I & XII)

Shogen's complaint alleges both common law and promissory fraud. Defendants argue that these claims fail because Shogen cannot show that they acted with the requisite level of scienter.

Both common law fraud and promissory fraud require a level of scienter higher than that required under the securities act. To prevail on either claim Shogen must be able to show an actual intention to deceive her on the part of the Defendants, rather than mere recklessness. To prove that Defendants committed common law fraud Shogen is required to show: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." Banco Popular N. Am. v. Gandi, 184 N.J. 161, 173 (2005) (quoting Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610 (1997)). The only case in

this jurisdiction discussing a claim of promissory fraud was decided by this Court in an unreported opinion, <u>Protocol Elecs., Inc. v. Transolutions, Inc.</u>, No. 03-4162 (SRC), 2005 U.S. Dist. LEXIS 44488, 2005 WL 1106132 (D.N.J. Apr. 29, 2005).[12]  In that case the Court applied Illinois law, stating that promissory fraud requires that a plaintiff prove that the defendant falsely represented his intent concerning future conduct without any intention to perform as promised. <u>Id.</u> at 2005 U.S. Dist. LEXIS 44488 * 21, 2005 WL 1106132 at *6.

As discussed in the previous section, Shogen cannot establish that Defendants knowingly, much less intentionally, made false statements to her.  Shogen's brief recounts numerous statements allegedly made by the Witchel Defendants and Cohen that were false.  (Pl.'s Br.(I) at 25-26.)  It does not attempt to explain how an inference that Defendants intended to defraud her might be drawn, nor is such an inference warranted here.  This is especially true given the heightened evidentiary standard—proof by clear and convincing evidence—that Shogen must satisfy to prevail on a claim for common law or promissory fraud.[13]  <u>Liberty Mut. Ins. Co. v. Land</u>, 186 N.J. 163, 174 (2006) ("the clear and convincing [evidence] standard applies in common law fraud actions"); <u>Athey Prods. Corp. v. Harris Bank Roselle</u>, 89 F.3d 430, 434 (7th Cir. 1996) (plaintiff must prove intent to defraud by clear and convincing evidence to prevail on a claim for promissory fraud).  <u>See</u> <u>Anderson</u>, 477 U.S. at 254 ("[I]n ruling on a motion for

---

[12]  The cause of action known as promissory fraud is an obscure cause of action.  Neither of the parties cite to a single New Jersey case mentioning the elements of this claim under New Jersey law, and the Court's own independent research has not uncovered any.

[13]  "[C]lear and convincing evidence[] is a higher standard of than proof by a preponderance of the evidence but a lower standard than proof by a reasonable doubt."  <u>Banco Popular N. Am.,</u> 184 N.J. 161 at 169.  This level of proof must produce "a firm belief or conviction as to truth of the allegations sought to be established."  <u>Id.</u> (quoting <u>In re Purrazella</u>, 134 N.J. 228, 240 (1993)).

summary judgment the judge must view the evidence presented through the prism of the substantive evidentiary burden.").

Because the Court concludes that Shogen has failed to produce evidence that would allow a reasonable factfinder to find that Defendants acted with the scienter required for common law and promissory fraud, the Court will grant Defendants' motion for summary judgment on those claims.

E.     Equitable Fraud (Count XIII)

Shogen also alleges in her complaint that Defendants committed equitable fraud.  Unlike common law fraud, equitable fraud does not require that a misrepresentation be knowingly false or intended to deceive.  Jewish Ctr. of Sussex County v. Whale, 86 N.J. 619, 625 (1981). ("The elements of scienter . . . knowledge of the falsity and an intention to obtain an undue advantage therefrom" are not necessary to prove equitable fraud.).  However, a party seeking to prove equitable fraud must still present evidence of misrepresentation and reliance.  Banco Popular N. Am, 184 N.J. at 174 ("Misrepresentation and reliance are the hallmarks of any fraud claim, and a fraud cause of action fails without them.").  Finally, the misrepresentation must be of a "presently existing or past fact."  Jewish Ctr. of Sussex County, 86 N.J. at 624.

Defendants argue that they are entitled to summary judgment on this claim because the fact that Global Aggressive had the right under the stock pledge loan agreement to freely alienate Shogen's pledged shares was a not, at the time they allegedly misrepresented to Shogen that her shares could not be sold barring default, a presently existing or past fact.  This is incorrect.  From the time that the agreement was faxed to Defendants, who in turn transmitted it to the Shogen, it was a presently existing fact that the loan agreement allowed Global Aggressive to alienate the

26

pledged collateral shares. If Shogen can present evidence that Defendants made a misrepresentations to her during this specific time period a factfinder would be entitled to find for Shogen.

The events that occurred during this critical time frame are hotly contested. Shogen testified that after the loan documents had been transmitted to her, she sought and received assurances from both Scharff Witchel and the Ruby Group that Global Aggressive was a reputable, multimillion dollar fund and that the transaction was reasonable. The Witchel Defendants deny that they discussed the Global Aggressive loan with Shogen at all—they merely forwarded her the documents. Cohen likewise denies consulting with Shogen during this period.

Here, a factfinder could believe Shogen's version of events that Defendants misrepresented the Global Aggressive transaction after it became a presently existing fact that under the loan agreement Shogen could be deprived of all interests in the pledged collateral shares. This is, therefore, an issue of credibility, which cannot be resolved on a motion for summary judgment. On a claim for equitable fraud, the plaintiff does not have to show that the defendants' representations were knowingly false. Jewish Ctr. of Sussex County, 86 N.J. at 625. Therefore her deposition testimony that false statements were made to her, after the full terms of the loan agreement became a presently existing fact, is sufficient to survive a motion for summary judgment, and the Court will deny Defendants' motions for summary judgment on this count.

F.    Negligent Misrepresentation (Count VI)

Count VI of Shogen's complaint alleges negligent misrepresentation. In order to prove negligent misrepresentation, Shogen must show that Defendants negligently made an incorrect

statement or statements which she justifiably relied upon, and that she sustained an injury as a consequence of her reliance.  <u>Carroll v. Cellco P'ship</u>, 313 N.J. Super. 488, 502 (1998).  <u>See also</u> <u>H. Rosenblum, Inc. v. Adler</u>, 93 N.J. 324, 334 (1983).  Because the Court has concluded, <u>supra</u>, in section III.C., that there is a disputed issue of material fact as to whether Defendants recklessly misrepresented the terms of the Global Aggressive stock pledge loan to Shogen, there is necessarily a disputed issue of material fact as to whether they made negligent misrepresentations as well.  As both parties note, negligent misrepresentation, unlike common law fraud or securities fraud, does not require scienter.  <u>Kaufman v. I-Stat Corp.</u>, 165 N.J. 94, 110 (2000).

Defendants argue that Shogen cannot show causation and reliance because it was Global Aggressive who inserted paragraph 1(b) into the loan agreement, and that conspicuous, written clause superceded any assurances Defendants' may have given Shogen prior to the loan agreement.  But Shogen testified that Defendants assured her that the pledged shares could not be sold *after* she received the loan agreement from Global Aggressive and that she relied on those assurances when she signed the loan agreement.  Likewise, Defendants' argument that it was Shogen's misconduct in removing the restrictive legends that caused her loss must also be rejected because, again, Shogen's testimony is that she removed the legends only after being instructed to do so by Defendants.  Whether Shogen did in fact rely on Defendants' assurances and whether such reliance was justifiable is a question of fact which the Court cannot resolve on a motion for summary judgment.  Therefore, the Court will deny Defendants' motion for summary judgement on the claims asserted against them for negligent misrepresentation.

G.    Breach of Contract (Count XI)

Shogen contends than she formed an oral contract with the Witchel Defendants, which they subsequently breached.[14]  The Witchel Defendants vigorously dispute these allegations. Shogen's complaint asserts ten specific duties that the Witchel Defendants undertook to perform in consideration of the payment which they later received from Shogen.  (Am. Compl. ¶ 96.) Under New Jersey law, "[a] contract need not be expressed in writing as long as the parties agreed to do something that they previously did not have an obligation to do."  Marilyn Manson v. N.J. Sports & Exposition Auth., 971 F. Supp. 875, 888 (D.N.J. 1997).

According to Shogen, Greg Witchel indicated to her in their first conversation that Scharff Witchel would advise her on the transaction and find her a reputable lender.  This loose language, however, cannot be construed as a promise to perform a specific act.  Shogen acknowledges that to establish an oral contract "a plaintiff must show that the parties agreed on essential terms and manifested an intention to be bound by those terms."  (Pl.'s. Br.(I) at 38.) See Weichert Co. Realtors v. Ryan, 128 N.J. 427, 435 (1992) ("A contract arises from offer and acceptance, and must be sufficiently definite 'that the performance to be rendered by each party can be ascertained with reasonable certainty.'" (quoting W. Caldwell v. Caldwell, 26 N.J. 9, 24-25 (1958))).  Whatever Shogen now claims her understanding was at the time, her deposition testimony does not allege that the Witchel Defendants manifested an intention to be bound by explicit terms.  The only terms that the Witchel Defendants manifested an intention to be bound

_____

[14] Shogen has also asserted a breach of contract claim against Cohen.  However, Cohen was never paid by Shogen.  The Ruby Group was remitted by Global Aggressive, and Shogen does not pursue the contract claim against Cohen in her opposition brief.  Accordingly, the Court will grant Defendant Cohen's motion for summary judgment on the breach of contract claim.

by were those in their standard NDNC form, which does not contain any of the specific duties which Shogen alleges that Defendants undertook. The Court, therefore, finds that there is no evidence from which a factfinder could reasonably conclude that an oral contract existed between Shogen and the Witchel Defendants and the Witchel Defendants are entitled to judgment as a matter of law.[15]  Defendants' motion for summary judgment will be granted as to this count.

      H.      <u>Unjust Enrichment (Count XV)</u>

Shogen argues that it would be unjust for Defendants to retain the benefit—that is, their fees—that they received as a result of the Global Aggressive transaction. "To establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." <u>VRG Corp. v. GKN Realty Corp.</u>, 135 N.J. 539, 554 (1994). "The unjust enrichment doctrine requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights." <u>Id.</u>

Shogen has not claimed that she ever expected remuneration from Defendants. Here, Defendants performed services for Shogen. They were the ones who expected remuneration for their services. That the ensuing transaction turned out to be detrimental to Shogen's interests does not mean that Shogen has a claim for unjust enrichment—Shogen has conferred no benefit upon Defendants within the meaning of the unjust enrichment doctrine and she never expected

---

    [15]  The Witchel Defendants have pled the New York Statute of Frauds, which explicitly requires that the contract Shogen alleges be in writing. N.Y. GEN. OBLIG. LAW § 5-701(a)(10) (requiring that an agreement "procuring an introduction to a party . . . or assisting in the negotiation or consummation" of a loan transaction must be in writing). New Jersey law contains no comparable provision that would require that an agreement for the services provided by the Witchel Defendants be reduced to writing. However, because the Court concludes that no oral contract exists as a matter of New Jersey law, it need not consider this argument.

any sort of remuneration from the Defendants.  Accordingly the Court will grant Defendants'
motion for summary judgment on Shogen's claims for unjust enrichment.

     I.     <u>Breach of Covenant of Good Faith and Fair Dealing (Count XI)</u>

Count XI of Shogun's complaint alleges a violation of the covenant of good faith and fair
dealing.  Defendants point out that such a covenant presupposes the existence of a valid contract.
<u>See, e.g.</u>, <u>Wade v. Kessler Inst.</u>, 172 N.J. 327, 340 (2002) ("Every contract contains an implied
covenant of good faith and fair dealing.").  As explained above, <u>see</u> <u>supra</u> section III.G., Shogen
has not alleged fact from which the Court could conclude that a valid contract existed.  Therefore
the Court will grant Defendants' motion for summary judgment on this count as well.

     J.     <u>Negligence (Count VIII)</u>

Defendant Cohen, but not the Witchel Defendants, has moved for summary judgment on
Shogen's negligence claim.  This claim asserts that, inter alia, Cohen failed to perform due
diligence for the Global Aggressive transaction and failed to adhere to industry standards in
safeguarding Shogen's interests.  "Under New Jersey law, a cause of action founded upon
negligence has four essential elements: '(1) duty of care, (2) breach of duty, (3) proximate cause,
and (4) actual damages.'"  <u>Wartsila NSD N. Am., Inc. v. Hill Int'l, Inc.</u>, 342 F. Supp. 2d 267, 278
(D.N.J. 2004) (quoting <u>Weinberg v. Dinger</u>, 106 N.J. 469, 484 (1987)).  The Morrow Report
contains expert opinion evidence that Cohen negligently caused Shogen's injuries by his failure
to perform due diligence in connection with the Global Aggressive loan.  (<u>See</u> Soos Cert., Ex. K,
Report of J.F. "Chip" Morrow.)  Whether Defendant Cohen failed to adhere to the standard of
care and skill in the regular course of discharging or performing duties as customarily performed
in his industry is a disputed question of fact that cannot be resolved on motion for summary

judgment.  The Court will therefore deny Defendant Cohen's motion for summary judgment on

Shogen's negligence claim.

       K.      <u>Willful and Wanton Misconduct (Count XIV)</u>

Shogen also alleges that Defendants committed willful and wanton misconduct.  <u>See</u>

<u>Leimgruber v. Claridge Assocs., Ltd.</u>, 73 N.J. 450, 454-55 (1977) (under New Jersey law

punitive damages may be awarded in cases where defendants have committed egregious, willful

and wanton misconduct).  However, the Court has already concluded that there is insufficient

evidence that Defendants knowingly defrauded Shogen.  <u>See</u> <u>supra</u> §§ II.C. & D.  Without

evidence that Defendants knew that Global Aggressive intended to sell the pledged collateral

shares there can be no willful or wanton misconduct as a matter of law.  The Court will grant

Defendants' motions for summary judgement on this issue.

       L.      <u>Breach of Fiduciary Duty (Count VII)</u>

Shogen argues that because she placed her trust in Defendants they had a fiduciary duty to

her at common law.  "The essence of a fiduciary relationship is that one party places trust and

confidence in another who is in a dominant or superior position."  <u>F.G. v. MacDonell</u>, 150 N.J.

550, 563 (1997).  "A fiduciary relationship arises between two persons when one person is under

a duty to act for or give advice for the benefit of another on matters within the scope of their

relationship."  <u>Id.</u>  Defendants argue that they are entitled to summary judgment because no

fiduciary relationship existed between themselves and Shogen.  They support this point by

arguing that they did not have the power to negotiate on Shogen's behalf.

In <u>United Jersey Bank v. Kensey</u>, 306 N.J. Super. 540 (1997), the New Jersey Appellate

Division listed three circumstances that could give rise to a fiduciary duty.  "The first involves

fiduciary relationships such as principal and agent or attorney and client." Id. at 551.  There is no indication here of an agency relationship.  Defendants neither negotiated terms for Shogen nor is there any indication that they were authorized to bind her contractually.  The second case arises when either party "expressly reposes . . . a trust or confidence in the other." Id. (quoting Berman v. Gurwicz, 189 N.J. Super. 89, 93-94 (1981)).  Although Shogen indicates throughout her deposition testimony that she trusted the Witchel Defendants and Cohen, who she presumed to be experts in this type of transaction, there is no testimony by any party indicating that she *expressly* reposed that level of trust or confidence in the Defendants before the consummation of the Global Aggressive transaction.

The final instance that gives rise to a fiduciary duty "includes contracts or transactions which in their essential nature, are 'intrinsically fiduciary,' and 'necessarily call[] for perfect good faith and full disclosure, without regard to any particular intention of the parties.'" Id. (quoting Berman, 189 N.J. Super at 94).  However, "fiduciary duties are not imposed in ordinary commercial business transactions." Alexander v. CIGNA Corp., 991 F. Supp. 427, 438 (D.N.J. 1997).  "The essentials of a confidential relationship 'are a reposed confidence and the dominant and controlling position' asserted by one side or party such that circumstances make it certain that the parties do not deal on equal terms." Id. at  437 (quoting In re Stroming's Will, 12 N.J. Super. 217, 224 (1951)).  Shogen has not presented any documents or testimony evidencing domination or control by Scharff Witchel or the Ruby Group.  While Shogen and the Defendants had a common interest in completing a successful transaction, that fact neither makes them partners nor negates the assumption that they were negotiating on equal terms and in arms length bargaining.  See, e.g., Coca-Cola Bottling Co. v. Coca-Cola Co., 696 F. Supp. 57 (D. Del. 1988)

(finding that no fiduciary duty existed between a company and distributor even though they shared a common interest).  Because Shogen has not presented evidence that would indicate the existence of a fiduciary relationship, the Court will grant Defendants' motion for summary judgment on Shogen's claim for breach of fiduciary duty.

## IV.    CONCLUSION

For the reasons stated in this opinion, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment.  Summary Judgment is granted as to Shogen's claims under the NJCFA and the NJLBS, and her claims for common law fraud, promissory fraud, breach of contract, unjust enrichment, breach of the covenant of good faith and fair dealing, willful and wanton misconduct and breach of fiduciary duty.  Summary Judgement is denied as to Shogen's claims under the Securities Act, for equitable fraud, negligence misrepresentation, and negligence.  An appropriate order will be filed herewith.

       /s/ Stanley R. Chesler
       Stanley R. Chesler, U.S.D.J.

Date: April 26, 2007